# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street, 10ᵗʰ Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara L. Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

February 20, 2026

**By ECF**
Hon. Margaret M. Garnett
United States District Court
Southern District of New York
40 Foley Square
New York, NY  10007

> Re: <u>United States v. Joel Antonio Alonzo</u>
>     25-Cr-305 (MMG)

Dear Judge Garnett:

This case involves the federal prosecution of a teenager for a suicide attempt.

Those words unfortunately are not hyperbole.  Last June, Joel Antonio Alonzo – a starving, homeless teenager who had not seen his parents for two years – suffered a psychotic break.  With the voice of a dragon telling him to kill himself, Joel reached for a security guard's holstered gun in the hallway of immigration court so that he could commit suicide.  He was subdued immediately.  It took psychiatrists three weeks to restore Joel to competency.  For eight months since then, Joel has been detained in the deplorable conditions of the MDC, isolated from his family and terrified of being deported.  He worked hard to stabilize his mental health.  Yet the government refused to defer this prosecution.  So here we are, with Joel – now barely twenty years old – begging not to be punished further for his self-harming behavior while in a state of acute psychosis.

The truth about this case is that the facts speak for themselves.  So below is a simple recitation of the facts about Joel Antonio Alonzo – an immigrant child who was separated from his parents, suffered a severe mental health crisis, attempted suicide, and was prosecuted for that suicide attempt by the government of the United States of America.

## I.     JOEL'S BACKGROUND.

### A.  <u>Joel's tumultuous upbringing and early signs of mental health issues.</u>

The fourth of eight children, Joel Antonio Alonzo grew up in a three-room wooden house in Honduras.  Joel never met his father.  He lived with his mother and stepfather, each of whom made their living selling food on the streets of Tegulcigalpa.  The household was unstable and abusive.  Joel's parents severely beat Joel and his siblings, his mother suffered from depression and paranoia that often left her unable to get off the couch, and his sister tried slitting her wrists.  Things were no better outside the home, where Joel regularly witnessed violent conflicts in the neighborhood.

Joel first began expressing suicidal thoughts at just eight years old.  Although he was briefly sent to a therapist, he was never medicated or cared for consistently.  Joel frequently transferred

between different schools and found it difficult to hold onto friends.  His main source of emotional support and friendship was his grandmother, who lived on the same street and practically raised him.

Around the same time that he became suicidal, MS-13 began terrorizing Joel's family.  Gang members demanded that Joel's grandmother relinquish her home so that they could turn it into a "casa loca," a place used for drug dealing, torture, and murder.  When she refused, the gang members burned her house to the ground.  They later did the same to Joel's aunt.  Joel's family filed police reports, but the corrupt Honduran police did nothing.  Meanwhile, the gang began recruiting Joel's brothers and uncles through threats of violence.  In 2017, one of Joel's uncles, with whom Joel was very close, refused to join and was murdered.  That loss was devastating for Joel, and he became increasingly anxious as he neared the age when he knew MS-13 would begin recruiting him as well.

Then in 2020, Joel's grandmother – his main source of support – died painfully of stomach cancer.  Joel cared for her during her illness and was by her side when she died.  He took her loss very hard and began to show signs of psychiatric decompensation.  He started suffering from hallucinations and delusions.  Joel's family, however, did not try to get him professional help.

In 2022, another of Joel's uncles refused to join MS-13.  In retaliation, gang members broke into Joel's home and beat his family while Joel hid under a blanket pretending to sleep.  When the uncle heard about what was happening and ran to the home to intervene, the gang members murdered him.  Joel's mother and stepfather realized that the situation in Honduras had become untenable and that the family needed to flee.

### B.  Joel's entry to the United States as an unaccompanied minor.

In 2022, sixteen-year-old Joel packed what few belongings he could carry and boarded a bus to Guatemala with his parents and siblings.  The family then crossed a river into Mexico.  There, they were stuck for months after they ran out of money.  They had to live in an "alberga," a Mexican government homeless shelter.  Hoping to help finance the rest of the trip, Joel took a backbreaking job on a Mexican farm, earning meager wages and physically suffering.  He became suicidal again.

Nearly a year after first leaving Honduras, Joel and his family pulled together enough money to complete their journey.  As they reached Eagle Pass, however, his mother panicked about crossing.  Hoping to seem brave for his family and knowing that returning to Honduras was not an option, Joel took his backpack and surrendered himself to U.S. Border Patrol agents.  He was only seventeen years old, and he was completely alone.  Joel was detained in a holding cell with other children before being paroled into the country as an unaccompanied minor.  He has not seen his mother or stepfather in the two-plus years since then.

Immigration authorities shipped Joel to New York City and held him in a shelter for unaccompanied minors.  Lost in a bureaucratic system in a foreign country and separated from his loved ones, Joel's depression deepened.  At his shelter intake, Joel told social workers that he had recently contemplated suicide.  The shelter staff took Joel to the hospital for a psychiatric evaluation.  Hospital psychiatrists discharged Joel with a recommendation that he continue to work with the social workers at the unaccompanied minor shelter.

Several weeks later, Joel was reunited with his sister, Kimberly, who had arrived in the United States.  Joel moved in with her, enrolled in school, and filed a formal asylum application.  But his living

conditions were extremely difficult: he shuttled between different addresses, had a hard time making friends, and failed classes due to not speaking English. His mental health deteriorated. He struggled to get out of bed and started showing up late to school. Kimberly brought Joel to the hospital and told doctors that he was severely anxious; Joel acknowledged that he had stopped sleeping. He was discharged once again.

In 2025, nineteen-year-old Joel began showing signs of psychosis. He stopped eating. He accused Kimberly of poisoning his food and hiding his belongings. He started talking to himself and describing hallucinatory visions. During a verbal argument that June, Kimberly struck Joel in the mouth. Joel called the police and Kimberly responded by kicking him out. He threw some belongings into a backpack and left, spending the next week living on the streets. Kimberly filed a missing persons report when she was unable to contact him. Joel was a mentally decompensating, homeless teenager who was alone in a foreign country. For several days he slept outside, did not eat, and contemplated suicide. And he became increasingly delusional and hallucinatory.

## C. The charged offense conduct, which occurred when Joel was in a mental health crisis.

Having gone several days without eating or sleeping, Joel began hearing voices telling him that people were after him and that he needed to kill himself. One of the voices belonged to a dragon; Joel began seeing the dragon appearing by his side to protect him. The dragon told Joel that if he committed suicide he would "be in a new world alone with the dragon, a world for just the two of us." Joel became convinced he was telepathic, imagined colors as all-encompassing, and started dissociating. As Joel describes it, "[I] didn't feel like I was in there."

On June 6, the dragon told Joel to go to immigration court to beg authorities for help from the people who were supposedly after him. There, a security guard approached Joel, and the dragon began encouraging Joel to commit suicide. Knowing it was wrong to do so, Joel reached for the security guard's holstered gun so that he could kill himself, and the guard easily subdued him in less than three seconds. The gun never came out of the holster, and the guard later complained of a slight "shoulder strain" for which he refused medical attention. Joel cried out that he wanted to kill himself.

## D. Mental health professionals spent weeks restoring Joel to competency.

Joel was involuntarily committed to a psychiatric hospital after the incident. Psychiatrists observed that he appeared to be responding to internal stimuli. Joel reported hearing voices telling him what to do, said that he was suicidal and wanted to kill himself in unrealistic ways such as by jumping into the ocean, and described getting messages from "the phone" and being able to make people visually disappear. The doctors quickly determined that Joel was acutely psychotic.

When Joel was initially admitted, psychiatrists noted his inappropriate affect, bizarre behavior including walking the hallways naked, and responses to internal stimuli. Over the next three weeks, however, Joel took antipsychotics and his mental state improved dramatically. He was diagnosed with psychotic disorder and, after nearly three weeks, was finally approved for discharge:

**06/26** - Patient presents much less oddly related, more attentive, more talkative, with more appropriate eye contact. Appears overall more organized with improved behavioral control since admission. Denies SI/HI/AVH. Patient received initiation doses of invega sustenna, will discontinue PO risperidone. Endorsing vague physical symptoms today s/p injection, will start cogentin to target possible EPS (no objective evidence of rigidity or dystonia on exam). Planning for discharge tomorrow.

### E. Joel's eight months at the MDC.

Three weeks after his arrest, Joel was finally presented in Magistrate Court. Upon meeting Joel, it was obvious that while he was competent, he was still struggling mightily. He also looked astonishingly young. He was a nineteen-year-old who looked like someone just starting high school.

Because ICE had lodged a detainer, Joel was detained without objection and taken to MDC Brooklyn. We had serious concerns for his safety: someone who looked like a fourteen-year-old boy could hardly be expected to protect himself at a violent federal jail. The MDC staff clearly had concerns as well, taking precautions that were abnormal: staff affirmatively reached out to counsel to make sure Joel should expect legal visits immediately; the Medical Department proactively sought out his psychiatric records; and corrections officers paid him extra attention in the visiting room.

The MDC staff had another reason to be concerned: Joel was not fully psychiatrically stable. A psychology note from July 1 indicates that Joel was acutely suicidal. He told doctors, "I want my mother, please I just want to kill myself." The note goes on:

While Mr. ALONZO was somewhat alert, he was not oriented to time, place, person, or circumstance. His hygiene and grooming could be described as disheveled. His affected appeared to be blunted and he maintained inappropriate eye contact throughout the contact. His speech was slow in rate and quiet in volume. His responses were often delayed, and he appeared to be responding to internal stimuli. He was polite, calm, and cooperative throughout the contact.

Joel spent his first week at the MDC on suicide watch. He began to show substantial improvement each day as he complied with his medication regimen. A staff psychologist noted that Joel "presents as vulnerable given his age (19 years old) and small stature." Recommending he come off suicide watch, the psychologist – who diagnosed Joel with "unspecified schizophrenia and other psychotic disorder" – observed:

the 07/01/2025 contact, he denied any current suicidal ideation and stated that the voices he was previously hearing had stopped. Per available records and his self-report, he maintained medication compliance. He was encouraged to maintain his medication compliance. Between 07/04/2025 and 07/06/2025, Mr. ALONZO continued to evidence improvements in his mood, and he consistently denied current suicidal ideation or auditory hallucinations. He also maintained medication compliance while on watch. While his speech has remained slow in rate/tone and low in volume, the aforementioned delays in speech lessened significantly. He also presented as more euthymic as evidenced by him smiling/laughing when this writer made a joke to facilitate rapport. Overall, he presented as significantly more stable. He attributed this improvement to his medication compliance and engagement in treatment.

Joel also began working with Karina Buruca, a social worker at the Federal Defenders. Given that his family could not visit him due to their immigration status, it was critical for Joel to maintain in-person contact with people who cared about him.[1] Ms. Buruca began meeting with Joel regularly, motivating him to continue making progress and to open up about his history of trauma. Joel's entire mood and personality began to change. He suffered, however, under the MDC's deplorable conditions, and in eight months did not have a single visit from his loved ones.

---

[1] Joel's family remains strongly supportive of him. Due to the government's abhorrent immigration enforcement methods, however, they are unable to provide letters of support or appear in person at his sentencing.

Recognizing the gravity of the issues that led to Joel's conduct, the Federal Defenders retained Dr. Angelica Torres to examine Joel. Dr. Torres met with Joel multiple times, reviewed his available psychiatric records, conducted a series of psychological tests, and spoke with his sister. Dr. Torres ultimately diagnosed Joel with post-traumatic stress disorder with dissociative symptoms, and other specified schizophrenia spectrum disorder and other psychotic disorder. It was Dr. Torres's opinion that Joel was suffering from psychosis at the time of the incident.

Joel has improved over the last eight months. He has become less disorganized and more engaged. He is psychiatrically stable: he was able to go off his medications at the end of the summer and has remained in stable condition. He is not "cured," a concept that is not a realistic possibility given his condition. He will need psychiatric care for the rest of his life. But he has come to understand the role that mental illness has played in his life and is committed to getting better. Joel is, in short, in a far better condition than at the time of his arrest.

A recent psychology note aptly describes Joel's improved state:

Due to Mr. ALONZO's denial of mental health concerns today, lack of recent reported significant mental health concerns, and ongoing demonstrated psychological stability, he was advised his Care Level may be reduced shortly. He denied any concerns about such.

O: Mr. ALONZO was neatly dressed and appeared hygienic. He was oriented to person, place, time, and circumstances. His affect and mood were appropriate and congruent. His rate, rhythm, and tone of speech were normal, as was his eye contact. There was no evidence of hallucinations, delusions, or abnormal thought processes. No psychomotor agitation/retardation was noted. Mr. ALONZO denied current suicidality.

A: There was no observable evidence Mr. ALONZO was in psychological distress during this contact. He was calm and cooperative during this contact, and appropriately engaged in treatment-oriented dialogue.

No concerns have been reported by staff or other inmates regarding Mr. ALONZO's functioning or behavior.

## F. Joel's acceptance of responsibility and the path forward.

Given that this incident involved a suicide attempt by a teenager with no criminal history that occurred during a psychotic break and which resulted in no injuries, we requested that the government defer Joel's prosecution. The government, however, insisted that Joel plead guilty to misdemeanor simple assault. While a misdemeanor conviction would often be considered a good outcome, here it will complicate (although, depending on the sentence, not foreclose) Joel's path to immigration relief. On February 11, Joel accepted responsibility for misdemeanor simple assault. The parties have agreed to an expedited sentencing and waived a pre-sentence report.

Following his sentencing here, Joel will likely be transferred to immigration custody. He faces an indeterminate amount of time in ICE's subhuman detention facilities. Immigration counsel is prepared to litigate his asylum claim and his application for Special Immigrant Juvenile Status. And Joel's loved ones – particularly his parents and siblings, who now live in the United States – are hopeful that they will be reunited with him and that he can continue receiving psychiatric support.

To that end, our office has located several mental health programs Joel can attend if he is released from immigration custody. Those programs cater to individuals regardless of their immigration status. Joel is looking forward to living with his parents, continuing to see a psychiatrist, and reenrolling in school.

Unfortunately, the current Administration's immigration enforcement tactics leave the path forward unclear.  At this time next year, it is possible Joel will be reunited with his parents in the United States, getting psychiatric care, and working toward a high school diploma.  Or Joel may be deported to Honduras, where he has few relatives left and will be a prime target for MS-13 recruitment.  Or he may find himself shipped off to a third-world prison in a country where he has no ties at all.  Under the current Administration, any of those outcomes are conceivable.

## II.    THE COURT SHOULD SENTENCE JOEL TO LESS THAN SIX MONTHS' IMPRISONMENT.

In a typical sentencing submission, this would be the point where we would discuss the § 3553(a) factors that the Court is required to consider.  But there are some cases where the facts simply speak for themselves – where a prosecution is so unwarranted and purposeless, and a person's background and the circumstances of an offense are so heartbreaking, that any effort at persuasion seems redundant.  This is such a case.  Joel does not belong in jail even one day longer for the conduct alleged here, given his tragic background and the pitiful circumstances in which the incident occurred.

That said, we want to stress that we are not seeking a time-served sentence.  Joel has been at the MDC for eight months.  Barring a special waiver, he will lose his eligibility for Special Immigrant Juvenile Status if he is sentenced to more than six months, which a "time-served" sentence would entail.  8 U.S.C. § 1255(h).  And as for his asylum claim, an immigration judge will need to determine if Joel's misdemeanor conduct constitutes a "particularly serious crime."  That determination involves weighing three factors: (1) the nature of the conviction, (2) *the type of sentence imposed*, and (3) the circumstances and underlying facts of the conviction.  *Matter of E-A-S-O*, 29 I&N Dec. 422, 425 (B.I.A. 2026).  Since the length of Joel's sentence has serious implications for his paths to immigration relief, we ask that the Court impose a clearly stated, short term of imprisonment below six months.  Truth be told, a one-day sentence would be sufficient but not greater than necessary here.

## III.    CONCLUSION.

What happened here is about as far from what we commonly think of as an assault on a federal officer as can be imagined.  The Court should impose a sentence that appropriately reflects the heartbreaking circumstances of this case and the abject impropriety of this prosecution.

Sincerely,

Michael Arthus
Joy Chen
Assistant Federal Defenders
212-417-8760

cc. (by ECF): AUSA Joseph Zabel